# Exhibit 47, Part 3

```
To:       martin.smith@neotericltd.com, alex.smith@neotericltd.com
Cc:       info@rvtgmbh.de, solotradeapprovals@solo.com
Subject:  Account (NEO01) - trade approved
Sent:     Mon, 23 Mar 2015 14:28:03 +0000
From:     solotradeapprovals@solo.com
```

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | |
|---|---|
| **Client Account** | NEO01 |
| **Counterparty** | Relative Value Trading GmbH |
| **Trade Type** | Lend |
| **Ticker** | NOVOB |
| **Product (Instrument)** | Stock Loan (Equity) |
| **Currency** | DKK |
| **Price** | 341.9000 |
| **Quantity/Contracts** | 6,847,676 |
| **Shapes** | Shape 1 6,847,676 |
| **Notional** | 2,341,220,424.40 |
| **Trade Date** | 23 March 2015 |
| **Settlement Date** | 24 March 2015 |
| **Haircut** | 0 |
| **Term** | Open |
| **Interest Rate Type** | Fixed |
| **Interest Rate** | 70.0000 |
| **Lending Fee Rate** | 91.0000 |
| **Cash Pool Type** | Fixed |
| **Dividends** | 100% |

Client: Neoteric Limited

Counterparty: Relative Value Trading GmbH

Trade Type: Stock Loan

Ticker: NOVOB

Instrument: Equity

Quantity: 6,847,676 shares

Price: DKK 341.9000

Notional: DKK 2,341,220,424.40

Trade Date: March 23, 2015

Settlement Date: March 24, 2015

**Figure 25 – Stock Loan Confirmation from Solo Capital to Neoteric Limited**[242]

189.   The main terms of the loan agreement – the number of shares, price, trade date and settlement date – were the <u>exact same</u> as the terms stated in the stock loan agreement between the Loggerhead Plan and Neoteric Limited.[243]

---

[242] ELYSIUM-03978529.
[243] ELYSIUM-03978529.



**Figure 26 – The Loggerhead Plan Solo Trade**

    **f. Stock Loan 3: Relative Value Trading GmbH purportedly loaned the Novo Nordisk shares it borrowed to Black Square Ltd**

190. Relative Value Trading GmbH then loaned its shares in Novo Nordisk, the same shares that it would borrow from Neoteric Limited, to Black Square Ltd. However, the trade approval email for this transaction was sent 6 minutes **prior** to the stock loan transaction it purportedly entered into with Neoteric Limited.[244]

191. This indicates that Relative Value Trading GmbH purportedly loaned shares in Novo Nordisk to Black Square Ltd **before** it had approval to borrow them from Neoteric Limited.

---

[244] ELYSIUM-03977720.

```
To:        info@rvtgmbh.de
Cc:        dilip@blacksquare.org, solotradeapprovals@solo.com
Subject:   Account (RVT01) - trade approved
Sent:      Mon, 23 Mar 2015 14:22:18 +0000
From:      solotradeapprovals@solo.com
```

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | |
|---|---|
| Client Account | RVT01 |
| Counterparty | Black Square Ltd. |
| Trade Type | Lend |
| Ticker | NOVOB |
| Product (Instrument) | Stock Loan (Equity) |
| Currency | DKK |
| Price | 341.9000 |
| Quantity/Contracts | 6,847,676 |
| Shapes | Shape 1 6,847,676 |
| Notional | 2,341,220,424.40 |
| Trade Date | 23 March 2015 |
| Settlement Date | 24 March 2015 |
| Haircut | 0 |
| Term | Open |
| Interest Rate Type | Fixed |
| Interest Rate | 70.0000 |
| Lending Fee Rate | 96.0000 |
| Cash Pool Type | Fixed |
| Dividends | 100% |

Client: Relative Value Trading GmbH

Counterparty: Black Square Ltd.

Trade Type: Stock Loan

Ticker: NOVOB

Instrument: Equity

Quantity: 6,847,676 shares

Price: DKK 341.9000

Notional: DKK 2,341,220,424.40

Trade Date: March 23, 2015

Settlement Date: March 24, 2015

**Figure 27 – Stock Loan Confirmation from Solo Capital to Relative Value Trading GmbH[245]**

192. The main terms of the loan agreement – the number of shares, price, trade date and settlement date – were the <u>exact same</u> as the terms stated in the stock loan agreement between Neoteric Limited and Relative Value Trading GmbH.[246]

193. The overall impact of this transaction, in aggregate, is that the Loggerhead Plan nearly simultaneously (1) purchased DKK 2,341,220,424 worth of Novo Nordisk stock from,

---

[245] ELYSIUM-03977720.
[246] ELYSIUM-03977720.

ultimately, Black Square Ltd; and (2) loaned the same DKK 2,341,220,424 worth of Novo Nordisk shares to, ultimately, Black Square Ltd in a closed loop circular fashion. There appears to be no legitimate business reason for the stock loans to take place in three simultaneous steps, from the Loggerhead Plan, to Neoteric Limited, to Relative Value Trading, and then to Black Square, other than to disguise through a complex series of paper transactions the fact that it is the Loggerhead Plan that is loaning to Black Square the very shares that Black Square is purportedly selling to the Loggerhead Plan.[247]

194. This circular trading pattern is no different than the circular loop involved in the Bernina Plan's trades, other than that Solo Capital inserted an additional layer of transactions to both the purchase/sale legs and the stock loan legs of the loop.



Figure 28 – The Loggerhead Plan Solo Trade

---

[247] I noted that 112 Plans purportedly traded, in aggregate, 713.4 million shares of Novo Nordisk stock on March 19, 2015, representing a total market value of approximately DKK 243,917,425,471 (or USD $34.8 billion). I reviewed the Plans trading data for every purported transaction related to Novo Nordisk stock on March 19, 2015 and concluded that they all followed the same steps, and had the same circular trading pattern, as described in the sample Novo Nordisk transaction purportedly executed by the Loggerhead Plan.

**CONFIDENTIAL**
**Expert Report of Bruce G. Dubinsky**
**December 31, 2021**
**Page 72**

### g. The Loggerhead Plan submits a dividend WHT reclaim request to SKAT

195. Acupay submitted the reclaim request to SKAT on behalf of the Loggerhead Plan.[248] The reclaim request package included a "Dividend Credit Advice" from Solo Capital representing that the Loggerhead Plan owned the 6,847,646 shares in Novo Nordisk described above and received a dividend on those shares net of withholding tax.

---

[248] SKAT_MDL_001_00060764-769.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 73



Figure 29 – Dividend Credit Advice[249]

196. Solo Capital then unwound the transaction by purportedly selling the Novo Nordisk shares it held and closing out the loan agreement.

197. In the end, there was no movement of cash or delivery of securities. The purported transactions were simply reversed, leaving only a paper trail to support the reclaim

---

[249] SKAT_MDL_001_00060764-769.

application. I have seen no evidence that any of the parties to this transaction loop ever actually owned shares in—or ever received a dividend payment from—Novo Nordisk. As such, I concluded that the entire trading loop was fictitious.



Figure 30 – The Loggerhead Plan Solo Trade

**D.     The Solo Trades in the 15 Bellwether cases all follow a similar trading pattern as compared to the sample simple loop transaction purportedly executed by the Bernina Plan and the sample complex loop transaction purportedly executed by the Loggerhead Plan (as discussed in detail above)**

198.    As discussed above, I reviewed the trade confirmations and other documentation related to all 2,559 of the Solo Trades purportedly orchestrated by Solo Capital on behalf of the Plans. Based on this review, I concluded that each of the purported Solo Trades followed a similar purported trading pattern as compared to the sample simple loop transaction purportedly executed by the Bernina Plan and the sample complex loop transaction purportedly executed by the Loggerhead Plan, and as such, I have concluded that in all 2,559

Solo Trades, the Plans never purchased actual Danish securities.[250]

### 1. Example #1: The purported purchase of DKK 659.3 million worth of stock in A.P. Moller Maersk A/S – B in March 2015

199. Another example of the Solo Trades that I reviewed was related to the purported purchase of shares in A.P. Moller Maersk A/S – B by the Roadcraft Plan in March 2015. This purported transaction is an exact replica of Step 1c of the Loggerhead example discussed above and is one leg of a circular transaction loop that is an exact replica of a complex loop as described above.

---

[250] Unlike the Loggerhead Novo Nordisk example used here, some of the loop transactions involved the "bundling" of shares at certain steps of the loop. For instance, on March 18, 2014, the Bernina Plan purported to purchase 4,270,392 shares of Danske Bank A/S stock using Novus ("Novus") Capital Markets Limited as a broker. ELYSIUM-02861054. Novus had purportedly sourced those shares from another broker, Bastion Capital London Limited ("Bastion"), but unlike in the Loggerhead example, this purported trade was for 112,687,781 shares, which included the 4,270,392 shares purportedly purchased by the Bernina Plan. ELYSIUM-02860996. Bastion had purportedly sourced these shares from four separate short sellers, in lots of 25,839,592 (ELYSIUM-02860957), 29,731,152 (ELYSIUM-02861022), 26,926,511 (ELYSIUM-02861227), and 30,190,526 (ELYSIUM-02861228). The last of these short sellers was Aronex Partners Ltd. ELYSIUM-02861228. (The remainder of these 112,687,781 were purportedly purchased by other U.S. Plans.)

The Bernina Plan's loan of the 4,270,392 shares was not bundled. It loaned the shares to Colbrook Limited (ELYSIUM-02896979), which loaned them to Rock Capital Private Fund Limited (ELYSIUM-02897325), which loaned them to Aronex Partners Ltd (ELYSIUM-02897273). Thus, although the Bernina Plan's purported purchases in the equity portion of the loop were aggregated with other plans' purported purchases, the shares that Bernina Plan purportedly purchased were still loaned out to the same party who had purportedly sold them (Aronex Partners Ltd). This bundling of shares into larger tranches through the broker intermediaries and from the ultimate short-sellers, and the allocation of those shares into smaller amounts among groups of Plans, further demonstrates the extensive pre-arranged coordination of the Solo Trades by Solo Capital and the various counterparties, and further supports my conclusion that the Solo Trades were fictitious, circular loops in which no real shares or money ever existed.



**Figure 31 – Trade Confirmation from Solo Capital to the Roadcraft Plan**

200. I have performed an extensive review of the documents related to each step of this transaction and have seen no evidence that (1) these shares were held at any of Solo Capital's custodians or sub-custodians; (2) the Roadcraft Plan had access to DKK 659.3 million—or approximately USD $96.1 million—of liquidity or real credit to execute this transaction; or (3) any cash was paid by the Roadcraft Plan or shares delivered related to this purported transaction. Accordingly, this further underscores my conclusion that the Solo Trades were fabricated by Solo Capital in a cookie-cutter approach and involved no actual Danish securities.

### 2. Example #2: The purported stock loan of DKK 630.8 million worth of shares in A.P. Moller Maersk A/S – A in April 2015

201. A second example of a Solo Trade that I reviewed was related to the purported stock loan of shares in A.P. Moller Maersk A/S – A by the FWC Plan in April 2015. This purported

transaction is an exact replica of Step 3a of the Loggerhead example discussed above and is one leg in a circular trading loop that is an exact replica of a complex loop as described above.

```
To:       trading@fwccap.com[trading@fwccap.com]
Cc:       martin.smith@colbrooklimited.com[martin.smith@colbrooklimited.com];
          alex.smith@colbrooklimited.com[alex.smith@colbrooklimited.com]; solotradeapprovals@solo.com[solotradeapprovals@solo.com]
From:     solotradeapprovals@solo.com[solotradeapprovals@solo.com]
Sent:     Wed 01-04-2015 15:46:57 (UTC)
Subject:  Account (FWC01) - trade approved
```

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | |
|---|---|
| **Client Account** | FWC01 |
| **Counterparty** | Colbrook Limited |
| **Trade Type** | Lend |
| **Ticker** | MAERSKA |
| **Product (Instrument)** | Stock Loan (Equity) |
| **Currency** | DKK |
| **Price** | 15,810.0000 |
| **Quantity/Contracts** | 39,897 |
| **Shapes** | Shape 1 39,897 |
| **Notional** | 630,771,570.00 |
| **Trade Date** | 01 April 2015 |
| **Settlement Date** | 07 April 2015 |
| **Haircut** | 0 |
| **Term** | Open |
| **Interest Rate Type** | Fixed |
| **Interest Rate** | 70.0000 |
| **Lending Fee Rate** | 87.5968 |
| **Cash Pool Type** | Fixed |
| **Dividends** | 100% |

Client: The FWC Capital LLC Pension Plan
Counterparty: Colbrook Limited
Trade Type: Stock Loan
Ticker: MAERSKA
Instrument: Equity
Quantity: 39,897 shares
Price: DKK 15,810.0000
Notional: DKK 630,771,570.00
Trade Date: April 1, 2015
Settlement Date: April 7, 2015

**Figure 32 – Stock Loan Confirmation from Solo Capital to the FWC Plan**

202. Additionally, similar to the Loggerhead example, the stock price that the loan agreement was premised on (DKK 15,810.00) was the price that the FWC Plan had purchased the shares at several days prior (on March 30, 2015), rather than the market price as of the date of the

stock loan on April 1, 2015.[251]

203. Furthermore, I have seen no evidence that (1) any cash collateral was paid or securities delivered; or (2) any mark-to-market calculations on the value of the loaned shares were performed. Once again, this further supports my conclusion that the Solo Trades were fake.

### E. Solo Capital pre-arranged the entire structure of the transactions to the Plans and the Plans had no ability to negotiate the financial terms of the arrangement

204. As a starting point, Solo Capital maintained a list of publicly traded Danish stocks that were scheduled to declare a dividend payment to its shareholders of record as of a specific date in the future.[252]

205. From this list, Solo Capital provided detailed trading instructions to those involved in executing the Solo Trades for the Plans. Specifically, Solo Capital selected the particular stock or security that was purportedly going to be "traded," the allocation of shares to each Plan, and information related to which broker and other counterparties would be used for the hedging and stock loan transactions.[253] I reviewed spreadsheets that were used by Solo Capital to slice up the Solo Trades and dole out portions to the various Plans. In other words, it wasn't the Plans that were dictating how much to purchase or when to do so, nor was it the brokers who were seeking liquidity in the market to fill the Plans' trade orders, but rather Solo Capital was the one who was dictating and pre-arranging each leg of the circular loops.

206. Additionally, Klugman provided an email to certain traders that supposedly acted on behalf of the Plans.[254] The subject line of the email was titled "Arbitrage instructions and questions" and contained step-by-step guidance to the traders regarding how to execute the purported trades on behalf of the Plans.[255] Based on these instructions, the traders were directed to perform a series of steps for each of the Solo Trades, which boiled down to the "traders" sending pro forma emails to create a paper record of trade orders.

207. For example, at around 7am on the "Trading Day" the traders were instructed to request

---

[251] ELYSIUM-04034158.
[252] Deposition of Richard Markowitz, Vol. 2, 411:22-415:8.
[253] Deposition of Richard Markowitz, Vol. 2, 417:2-428:9.
[254] Klugman Exhibit 1777.
[255] Deposition of Richard Markowitz, Vol. 2, 408:22-410:9.

liquidity from a broker (identified by Solo Capital) using 34 separate emails—one for each of the 34 pension plans that were participating in this structure.[256] The issuing of 34 emails all at once for the 34 Plans shows the pre-arranged bulk nature of the Solo Trades. Further, the fact that 34 Plans in this example were participating in this one transaction also shows that the transactions were not custom tailored to each Plan based upon their own risk profile, investment strategy or time horizon, but rather the transactions were simply carved up and doled out to each Plan by Solo Capital.

> **Trading Day**
> 1) Around 7am, request for liquidity (34 emails)
>    a. Response will take 10 minutes to 1 hour
>
> Good Morning – hope all is well.
>
> Pursuant to Section 3.3(a) of the Guarantee Deed among Solo Capital Partners LLP, California Catalog Company Pension Plan and NOVUS CAPITAL
>
> California Catalog Company Pension Plan – Account CAL01 – hereby seeks liquidity for the following transactions:
>
> - BUY CASH EQUITITES
> - ISSUER NAME – DANSKE BANK A/S
> - ISIN – DK0010274414
> - SHARES – 4,102,943
> - PRICE – End of Day
> - TRADE DATE – 18 March 2014
> - SETTLEMENT DATE/STOCK PURCHASE VALUE DATE – 24 March 2014
> - BROKER – NOVUS CAPITAL
>
> Please contact us to confirm what you are seeing and if you have liquidity to offer.

**Figure 33 – Trading Instructions**[257]

208. After the initial request for liquidity, step 2 in the guidelines indicates that the broker "responds back via email and say will seek liquidity" [SIC] and "get custodian approval (34 emails)."[258] Next, step 3 in the process instructs the pension plan's representative to respond

---

[256] Deposition of Richard Markowitz, Vol. 2, 411:5-412:11.
[257] Klugman Exhibit 1777.
[258] Klugman Exhibit 1777.

back and say "Okay, we will seek custodial approval in the meantime (34 emails)."[259] Significantly, the brokers did not have to actually seek the liquidity. Rather, it was pre-ordained that the broker would "find liquidity" for every single trade order from the Plans but in reality, since the entire transaction was pre-ordained, the so called "liquidity" was already in place.

209. Step 9 says "Take forward price and put into **premade** email to be sent to the forward counterparty (34 emails)."[260] Further, a template of this premade email is included within Step 9 of the instructions in Figure 34 below.

---

[259] Klugman Exhibit 1777.
[260] Klugman Exhibit 1777.

> 2) Broker responds back via email and say will seek liquidity, get custodial approval (34 emails)
> 3) We respond back and say ok, we will seek custodial approval in the meantime (34 emails)
> 4) Upload spreadsheet to TAS with corresponding account numbers **ONLY AFTER ALL BROKER RESPONSES**
>    a. Deadline to hear back from ALL brokers is 1hr before market close before uploading spreadsheet to TAS
> 5) Receive email from system saying "Submission Acknowledged" (1 email)
> 6) Wait for market to close
> 7) At market close, get skype message from Pogo on accurate closing price and forward price and confirm pricing
> 8) Broker also sends closing price (34 emails)
> 9) Take forward price and put into **premade** email to be sent to the forward counterparty (34 emails)
>
> Hope all is well.
>
> We are looking to enter into the following physically settled OTC forward.
>
> SELL ▓▓▓▓▓ - 20th June 2014 expiry - PNDORA DC @ dkk ▓▓▓▓▓
>
> Please let me know if this works for you.
>
> 10) Receive email from forward counterparty confirming price (34 emails)
>     a. We respond to forward counterparty "Okay, we will now seek approval."
> 11) Go to TAS, add price for forward contract, will get TAS acknowledgement for all 34 funds (1 email from Old Park Lane)
> 12) Within 1-2hrs you receive approval for both trades (Each account gets 2 approval emails, 1 for stock and 1 for forward from Old Park Lane, for a total of 64 emails)
> 13) After Old Park Lane approval, broker will email on stock saying its approved with custodian and sends confirms to follow

**Figure 34 – Trading Instructions[261]**

210. The instructions further state that the Plans' representatives should "prepare loan documents 34 times (cash collateral is price x shares)" as of T+2 (referring to two days after the purported purchase of the stock).

211. Then on T+3, the Plans' representatives were instructed to "look for email for stock borrow, times will vary but should be early AM EST." According to Markowitz, this meant

---

[261] Klugman Exhibit 1777.

that the Plans were to expect the stock lending counterparty to send an email to the Plans.[262] However, what is not clear is how the stock lending counterparties—if they were truly third parties not affiliated with Solo Capital—would know on each occasion to reach out to the pension plans to see if there was interest for a stock loan, and in the exact amount that the Plan happened to purchase.

**T+1**

    14) By next day, broker should have sent confirm by now, electronically we will sign forward contract through TAS

**Stock Borrow**

**T+2**

    1) Prepare loan document 34 times (cash collateral is price x shares)

**T+3**

    2) Look for email for stock borrow, times will vary but should be early AM EST
    3) We respond "yes we have an interest, please see attached terms (attach term sheet) and if acceptable we will seek approval from our Custodian now"
    4) Borrower will respond with a yes/no and say please seek approvals.
    5) We Respond "will seek approval"
    6) Go into TAS to seek approval (upload spreedhseet)
    7) Wait for approval from Old Park Lane in email (34 emails)
    8) Done

Figure 35 – Trading Instructions[263]

212.    The above email from Klugman—which memorializes the step-by-step instructions on how to execute the purported transaction—illustrates how these transactions were all pre-arranged by Solo Capital and Shah. In fact, they literally directed the various entities to send emails using email templates that were provided by Klugman, with the missing information to be filled in as instructed for each respective transaction. Further, they selected the specific securities, set out the terms, the allocations for each plan, the prices, the trade dates, and the

---

[262] Deposition of Richard Markowitz, Vol. 2, 425:4-425:25.
[263] Klugman Exhibit 1777.

counterparties—everything was orchestrated in advance by Solo Capital on behalf of the Plans. The "brokers" invariably filled each and every "order" as per Solo Capital's direction because they did not actually go into the market to obtain real shares.

### F.  The Plans did not have sufficient capital, liquidity or access to real credit to complete the purported Solo Trades but for the circular nature of the structured scheme

213. Based upon a review of available records and bank statements, the LLC sponsors of the Plans had limited, if any, legitimate business operations and were, at best, thinly capitalized, with opening bank balances of typically only a few thousand dollars or less.[264] As a result, the LLC sponsors of the Plans typically had little if any money to contribute to the Plans, or to pay salary to the plan participants from which the participants could contribute to the Plan.

214. Not surprisingly, the newly formed 401(k) plans created by these closely held LLCs were also thinly capitalized, as few contributions were made to the Plans. As a result, the Plans lacked the liquidity and financial wherewithal necessary to purchase the shares that were supposed to be the subject of the Solo Trades and which were worth hundreds of millions of dollars in certain instances.[265]

215. The purported trades executed by the Plans were all structured to appear as over-the-counter ("OTC") trades.[266] Despite the Plans not having the financial wherewithal to execute trades in the hundreds of millions of dollars, nor the credit history to back up such trades, nevertheless the trades were filled nearly instantaneously (see *e.g.* discussion *infra* on the sample Solo Trades purportedly executed by the Bernina Plan and the Loggerhead Plan). The Plans' ability to instantaneously and repeatedly obtain financing through the stock loans, notwithstanding the Plans' complete lack of creditworthiness, is further evidence that the purported purchases of securities were not real. Consistent with this pattern, it appears that the offshore stock loan counterparties such as Neoteric Limited were also thinly capitalized and would not have had capital to use as the cash collateral component of the stock loan

---

[264] *See*, for example TD_0001381-1445 (Ackview LLC); JPM00000198-282 (Blackrain Pegasus LLC); OCEANFIRST_00001573-1642 (Oaks Group LLC).
[265] See Exhibit 3
[266] OTC means that investors engage in transactions with each other through informal networks rather than on a centralized exchange like the Copenhagen Stock Exchange.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 84

transactions.

### G. The Trading Pattern At North Channel Bank Is Consistent With The Solo Trades

216. Two of the Plans that participated in the Solo Trades also participated in similarly structured trades at another custodian bank, North Channel Bank ("NCB"). In the Spring of 2014, the two Plans, the Omineca Pension Plan ("Omineca") and Vanderlee Technologies Pension Plan ("Vanderlee") participated in 5 and 6 structured trades, respectively, at NCB. [267]

217. Current management of NCB performed an investigation of tax vouchers issued by NCB on behalf of various U.S. pension plans for the purpose of submitting refund claims to SKAT. According to Gunnar Volkers, a current managing director at NCB, each of the tax vouchers issued for the Omineca and Vanderlee Plans was false.[268] Mr. Volkers confirmed that the Plans' structured trades at NCB were "circular" and "designed" to create a "closed shop" in that all participants in the trades were customers of NCB.[269] Because of this design, NCB held no shares on behalf of the Plans (or any of its other customers) as a result of the trades, and the purported shareholdings on the NCB-issued tax vouchers were "fictitious."[270] Since there were never "any real shares," Mr. Volkers further confirmed, NCB never received "any real dividend payment" on behalf of the Plans (or any of its other customers), and the NCB-issued tax vouchers did not reflect "real money credited to the account."[271] In September 2019, NCB pleaded guilty to "collusive serious fraud against the Danish state," which fraud included the structured trades at NCB in which the Omineca and Vanderlee Plans participated.[272] Mr. Volkers' testimony regarding the purported trading through NCB is consistent with my analysis and conclusions for the Solo Trades.

---

[267] SKAT_MDL_001_00060281 (Omineca) ; SKAT_MDL_001_00059631 (Vanderlee).
[268] Volkers Tr. at 13:18-14-1, 19:16-45:8.
[269] *Id.* at 19:21-20:17, 76:17-77:14.
[270] *Id.* at 54:11-57:2.
[271] *Id.* at 56:18-59:5.
[272] *Id.* at 71:2-75:18.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 85

## VII. OPINION NO. 2: THE SOLO TRADES GENERATED MILLIONS IN WITHHOLDING TAX REFUNDS, BUT THE PLANS WERE LEFT WITH ONLY A FRACTIONALLY SMALL AMOUNT OF THE TOTAL REFUNDS PAID BY SKAT

218. I performed a forensic accounting analysis of the subsequent cash flows of tax refund payments that were paid by SKAT to payment agents acting on behalf of the Plans. Setting aside fees provided to payment agents and purported "trading fees" (which together generally make up approximately 2% of the refund payments), the payments were distributed to three categories of recipients.

219. The first recipient is Ganymede Cayman Limited ("Ganymede"), an offshore Cayman Islands entity that invoiced the Plans for the majority of the refund amounts. Ganymede was essentially an alter-ego of Solo, owned and controlled by Shah.[273] In fact, many of Ganymede's invoices directed the Plans to make Ganymede's payments to a Solo Capital bank account.[274]

220. The second category of recipients are "Recruiters." These individuals, which include Richard Markowitz, John van Merkensteijn, Robert Klugman, Doston Bradley, Matthew Tucci, Roger Lehman, and Gavin Crescenzo, recruited others to establish pension plans that would then submit tax refund claims to SKAT.

221. After the payments to Ganymede and its affiliates, these Recruiters received a large majority (often over 90%) of the remaining share of the refund payments generated by the Plans they had helped establish. In the case of Markowitz, van Merkensteijn, and Klugman, these payments were made by establishing the partnership arrangements referenced in Section V.A above, in which the Plans paid entities controlled by Markowitz, van

---

[273] Deposition of Richard Markowitz dated April 8, 2021, 200:24-201:13. Sanjay Shah was the shareholder of Ganymede from September 20, 2011 until he transferred the share to Elysium Global Limited, another entity he controlled, on July 11, 2014 (CN012_318_001-00000042; ELYSIUM-05295222). He also acted as a director of Ganymede, as did Sanjeev Dave, Graham Horn, Rajen Shah, Guenther Grant-Klar (CN012_322_001-00000001 at 76), who were all also associated with Solo (ELYSIUM-00150387).

[274] *See*, for example:

- Invoice from Ganymede to Ackview LLC Solo 401k Plan provides "Solo Bank Details" (ACKVIEW00000199). The account number listed, 64338333, is a Barclays client money account held by Solo (SCPADMINISTRATORS_00003319).

- Invoice from Ganymede to The DMR Pension Plan provides "Solo Bank Details" (DMR00000317). The account number listed, 64105155, is a Barclays currency account held by Solo (SCPADMINISTRATORS_00004660).

Merkensteijn, and Klugman. Lehman, Bradley, Tucci, and Crescenzo did not use a partnership structure. Instead, they set up shell entities to receive the majority of their payments. The shell entities were paid by Solo itself, which routed the funds through Ganymede and other offshore entities controlled by Shah.

222. The third category of recipients are the Plans themselves and/or the individual Plan participants. The Plans associated with these individuals received a miniscule portion of the tax refund payments submitted on their supposed behalf, with some Plans and/or Plan participants receiving no payment at all.

223. The payments ultimately retained by these Plans were significantly less than those retained by Plans established by some Recruiters, such as Markowitz, van Merkensteijn, and Klugman. This latter category received a larger share of the refund payments (though still less than what Solo pocketed).

224. In performing the cash flow analysis, I also observed that the only payments to the Bellwether Plans from the Solo Trades were from tax refund payments by SKAT. There were no cash flows to the Plan's bank accounts resulting from the receipt of any actual dividends or from any profits related to the purported trading.

### A. Ganymede/Solo

225. SKAT's payments of tax refunds to the Plans were first sent to various Payment Agents, who had submitted applications on behalf of the Plans. After taking their fee (typically less than 1% of the refund), the Payment Agents typically transferred the rest of the funds to the Solo Custodians, where the funds were deposited in the Plans' accounts. The majority of the tax refunds were then disbursed from these accounts for payment of invoices generated by Ganymede.

226. According to Ganymede's invoices, the payments by the Plans were in exchange for "fees due under services agreement."[275] The invoices provide no further detail on the supposed services Ganymede was providing that warranted such a large share of each tax refund payment. I have also reviewed various Tax Reclaim Advisory Services Agreements between the Plans and Ganymede. The Agreements are similarly vague regarding the actual

---

[275] See, for example, Invoice from Ganymede to Roadcraft dated July 7, 2015 (MPSKAT00010288).