# Exhibit 45, Part 11 of 15

Registreringen af ejerskabet af aktierne er under dansk lovgivning dog ikke nogen forudsætning for at erhverve ejerskab. Registreringen er kun deklaratorisk og tjener sikringen af rettighederne som ejer mod tredjemand. På dette punkt adskiller dansk lovgivning sig fundamentalt fra tysk lovgivning. Det er derfor så fatalt for Skattestyrelsen at basere hele styrelsens argumentation i sagen på tysk retspraksis.

Skattestyrelsen tillægger registreringen af ejerskabet hos custodian en betydning for ejerskabet, som denne ikke har. Pensionsplanens ejerskab starter ikke først ved registreringen af købet hos custodian, hvorfor der heller ikke er tale om et "gennemgangs-ejerskab" af aktierne for få minutter, når først pensionsplanen registreres som ejer, og aktielåntager dernæst umiddelbart efter registreres som civilretlig ejer under aktieudlånet. Pensionsplanen var ejer af aktierne allerede fra matchingen af købsordren.

**2.4.2.5 Transaktionernes løbetid**

Som anført ovenfor blev de købte aktier aldrig leveret under forward hedgen, idet pensionsplanen altid differenceafregnede mellemværendet med forwardmodparterne.

Pensionsplanen holdt aldrig aktierne i netop samme periode som forward kontraktens løbetid. Gennemsnitligt gik der 90 dage mellem pensionsplanens køb og salg af aktierne. Denne løbetid blev opnået ved enten (1) at forlænge forwardkontrakterne (såkaldt "roll-over"), (2) ved at købe en anden forward fra markedet med samme afviklingsdato som den oprindeligt solgte forwardkontrakt eller (3) ved en tidligere differenceafregning af den solgte forwardkontrakt. At forwardens løbetid generelt ikke blev overholdt, er dokumentation for, at det drejer sig om ægte transaktioner, idet de er underlagt markedernes bevægelser.

Skattestyrelsens påstand om, at pensionsplanen skulle have handlet aktierne så hurtig efter hinanden, at det ikke var muligt at identificere den retmæssige ejer, er således tydeligvis ikke korrekt. Når der går 90 dage mellem køb og salg af aktierne, giver det ingen mening at tale om "looping" af aktierne.

Den af Skattestyrelsen fremførte påstand om "looping" lader til at være en påstand, der helt ukritisk er overtaget fra de tyske "cum ex-sager". Dette, til trods for at Skattestyrelsen og Skatteministeriet begge er af den overbevisning, at (1) cum ex-trading ikke er mulig i Danmark, og at (2) ingen af pensionsplanerne angiveligt slet ikke skulle have købt nogen danske aktier. Ønsker Skattestyrelsen virkelig at støtte sig til den tyske argumentation, må Skattestyrelsen først indrømme, at (1) dette drejer sig om en cum ex-sag, og (2) alle pensionsplanerne virkelig købte og solgte danske aktier. Tyskerne har, i alle de mange år de har kæmpet for at ændre lovgivningen for at forhindre cum ex-trading, aldrig påstået, at der slet ingen handel fandt sted. Tyskerne indrømmer desuden, at der eksisterede en mangelfuld lovgivning.

Pensionsplanen var i stand til at lade 90 dage gå, inden de solgte aktierne igen, fordi finansieringen var sikret ved et aktieudlån. Så længe pensionsplanen realiserede et positivt resultat ved aktieudlånet (dvs. så længe aktieudlånsgebyret oversteg renterne på den kontante sikkerhedsstillelse), eller pensionsplanen i det mindste ikke realiserede et tab, der oversteg arbitragegevinsten, kunne pensionsplanen holde på aktierne og lade aktielånet løbe videre.

I de tilfælde hvor gebyret for aktieudlånet oversteg renterne, som pensionsplanen skulle betale for den kontante sikkerhedsstillelse, og pensionsplanen således realiserede en gevinst på at opretholde aktieudlånet, var det enten modtagelsen af re- fusionen eller udviklingen af priserne på aktiemarkederne, der bevirkede, at pensionsplanen lukkede samtlige positioner. Da forwardkontrakten var solgt, til en pris der var ude af balance med det aktuelle aktiemarked, kunne den normale prisudvikling af såvel aktiemarkedet som også forwardmarkedet bevirke, at pensionsplanen ville realisere de hidtidige gevinster og ikke løbe yderligere risici.

Den kalkulerede gevinst, som pensionsplanerne skulle realisere, lå på samme niveau som udbytteskatten, og når den var nået, var den målsatte gevinst realiseret, og positionerne lukket.

### 2.4.2.6 Positionerne lukkes

Som alle pensionsordninger har en solo 401K-pensionsplan som mål at generere et overskud og under alle omstændigheder undgå at realisere tab.

Udbyttearbitrage er her en oplagt investeringsform, idet traderen ved en nøje overvågning af investeringen kan lukke positionerne i tide til at undgå at realisere et tab.

Pensionsplanen ved, i det øjeblik hvor aktierne købes, og forward kontrakten sælges, hvilken gevinst der kan realiseres (købs- og salgspriser er begge kendte). De eneste usikkerhedsfaktorer, som transaktionen er forbundet med, er, (1) om og hvornår refusionen udbetales, og (2) omkostningerne forbundet med aktieudlånet og dermed med finansieringen af aktiekøbet.

Pensionsplanen ved, at salgsprisen på forwarden ligger under købsprisen for aktierne. Det er også ganske normalt, da udbyttet forfalder mellem aktiernes købsdato og forwardkontraktens udløbsdato. Hvis salgsprisen på forwarden plus bruttoudbyttet ligger over aktiernes købspris (på spotmarkedet), kan pensionsplanen regne med at realisere en gevinst. Fra denne gevinst er pensionsplanen kun nødt til at trække omkostningerne for aktieudlånet fra.

Betingelserne for aktieudlånet (= renterne på den kontante sikkerhedsstillelse og gebyret for aktielånet) er konstant genstand for genforhandlinger, idet både aktie- långiver og aktielåntager på ethvert tidspunkt kan opsige aktielånet. Det betyder i praksis, at de aktuelle markedsbetingelser for aktieudlån konstant har direkte indflydelse på omkostningerne for transaktionen. Stiger omkostningerne for aktieudlånet, således at pensionsplanen ikke længere kan realisere en gevinst, hvis refusionen ikke modtages, er pensionsplanen nødt til at lukke samtlige positioner: sige aktieudlånet op, sælge aktierne og købe en forward/forwarden.

Aktielånet kan siges op med dags varsel.

Forwardkontrakten kan enten købes tilbage, eller pensionsplanen kan indgå en tilsvarende forwardkontrakt over køb af samme antal aktier, som den tidligere har solgt, med samme afviklingsdato som det oprindelige salg.

Salget af aktierne sker helt efter samme procedure som købet af aktierne beskrevet ovenfor. Nu er pensionsplanen blot sælger ikke køber.

### 2.4.2.7 Gevinsten realiseres

Pensionsplanen starter hele transaktionen med et likviditetsmæssigt tab: Pensionsplanen har købt aktierne for deres fulde værdi – inklusive bruttoudbyttet – og den næste dag (på ex-datoen) handles aktierne til en lavere værdi. Teoretisk set skulle denne lavere værdi svare til bruttoudbyttet. Markederne reagerer dog anderledes end teorien. Sommetider falder aktieprisen mere, sommetider mindre end bruttoudbyttet.

Faktum er dog, at markedsprisen af de af pensionsplanen købte aktier allerede dagen efter købet falder. Dette "tab" udlignes af to betalinger: nettoudbyttet og refusionen. Det betyder, at tabet på den meget likvide aktieværdi erstattes af to mindre likvide aktivposter: kravet på nettoudbyttet og

refusionskravet. Mens nettoudbyttet i reglen modtages få dage efter aktiekøbet, varer det flere måneder, inden refusionen bliver modtaget.

Bogholderimæssigt realiserede pensionsplanen heller ikke noget tab dagen efter købet, på trods af at markedspriserne for aktierne faldt, for pensionsplanen solgte samtidig en forward. Summen af værdien for forwarden, nettoudbyttet og udbytterefusionen var altid mindst den samme som købsprisen af aktierne. Formålet med en forward-hedge er jo netop at udligne det tab der sker på værdien af aktierne ved en tilsvarende stigning i værdien af hedgen.

Gevinsten, som pensionsplanen realiserer, stammer således ikke fra refusionen. Refusionen inddækker kun tabet på aktieværdien. Gevinsten stammer derimod enten fra et overskud realiseret under aktieudlånet (hvis gebyret for aktieudlånet oversteg renterne, der skule betales på den kontante sikkerhedsstillelse), fra salget af aktierne eller fra differenceafregningen af forwardkontrakten.

Grunden til, at det regnskabsmæssigt giver indtryk af, at pensionsplanens gevinst var refusionen (jf. Skattestyrelsens sammenfattende indlæg i førersagerne af den
9. august 2019, afsnit 4.2, side 24), er den, at pensionsplanen principielt lukkede sine positioner, når den gevinst, som pensionsplanen kunne realisere under aktieudlånet, aktiesalget og/eller forwardkontrakten udgjorde samme værdi som refusionen. Ville pensionsplanen lade investeringen løbe videre, kunne pensionsplanen risikere at realisere et tab: Nemlig i tilfælde af at refusionen ikke ville blive udbetalt.

**2.4.2.8 Sammenfattende bemærkninger om forretningsmodellen og trans- aktionerne**

I nærværende sag købte pensionsplanen de danske aktier inden udbyttets ex- dato, dvs. inden udbyttet blev trukket fra aktien. Den blev ejer af aktierne og udbyttet på baggrund af en endelig og bindende aftale om køb af aktierne.

Denne aftale blev indgået, ved at pensionsplanens købsordre elektronisk blev matchet med en salgsordre ved en mægler. Pensionsplanen betalte 100 pct. af den aktuelle markedspris, inden udbyttet blev trukket fra aktiens værdi. Købsprisen var således inklusive 100 pct. af bruttoudbyttet.

Da pensionsplanen havde adgang til en dobbeltbeskatningsoverenskomst, der giver den ret til refusion af udbytteskatten, havde aktierne også denne værdi for pensionsplanen, selvom de umiddelbart kun modtog nettoudbyttet på sin konto hos sin custodian.

Aktierne blev betalt tre henholdsvis fire dage efter købet ved at låne aktierne ud efter udbyttedatoen og derved modtage en kontant sikkerhedsstillelse svarende til købsprisen for aktierne. De enkelte aktielån blev trukket under GMSLA'en, der var indgået forud for aktiehandlen som en rammeaftale. Detaljerne for hvert enkelt aktielån blev fastlagt ved e-mailkorrespondance. E-mailkorrespondancen fremlægges som bilag 80.

Den økonomiske risiko forbundet med transaktionen blev styret ved hjælp af en forward hedge (i 2012 anvendtes futures til samme formål). Samme dag som aktierne blev købt, blev der indgået en forward hedge over salget af aktierne på et senere tidspunkt til en fastlagt pris. Aktierne blev dog i ingen af sagerne leveret under forward hedgen. Forward hedgen blev altid differenceafregnet. Derved var risikoen for at miste ejerskabet til aktierne ved indgåelsen af hedgen udelukket.

Til illustration af forløbet af transaktionerne i den af pensionsplanen gennemførte udbyttearbitrage henvises til tidslinjen nedenfor. Tidslinjen illustrerer endvidere, at pensionsplanen umuligt kan have solgt de "samme" aktier under en forwardkontrakt, som de lige havde købt samme dag, selv hvis der

ses bort fra det faktum, at forwarden generelt blev afviklet ved differenceafregning, og at der aldrig blev leveret aktier under forwardkontrakten.



Det var forskellen mellem prisen for aktien på spotmarkedet og prisen for aktien på forwardmarkedet, der fik pensionsplanen til at købe aktierne umiddelbart før udbetalingen af udbytte. Pensionsplanens trader kunne se, at salgsprisen på forward- markedet ikke lå lige så langt under prisen på spotmarke-det, som bruttoudbyttet matematisk ville medføre. Dette kan som anført bland andet skyldes, at de sæl- gere, der ønsker at købe aktierne tilbage efter udbyttedatoen, tilbyder mere end normalt for akti-erne, da udbyttet af deres aktier beskattes med 27 %, hvorfor disse sælgere kan tilbyde en højere pris for forwarden end andre købere. Grunden hertil er en øget efterspørgsel fra markedet på at købe ak-tier efter udbyttedatoen (fx fra dem der har solgt aktierne inden udbyttedatoen).

Ved at købe aktien, modtage nettoudbyttet samt refusion af indeholdt udbytteskat og sælge aktien igen til en lavere pris (aktieprisen falder efter udbetaling af ud- bytte) kunne pensionsplanen realisere en gevinst. Det var denne gevinst, der var formålet med hele transaktionen – og det, som skabte det økonomiske overskud. Hensigten med transaktionerne var således ikke blot at opnå refusion af udbyt-teskat fra de danske skattemyndigheder, sådan som det påstås af Skattestyrelsen. Tværtimod bevir-kede den efterfølgende refusion af indeholdt udbytteskat blot, at dispositionen var skattemæssigt neu-tral for pensionsplanen.

Udbyttearbitrage er således intet andet end en normal arbitrageforretning. Det eneste specielle ved udbyttearbitrage er, at den gennemføres omkring datoen for udlodningen af udbyttet. Det er netop det faktum, at selskabet har til hensigt at ud- lodde et udbytte, der bringer markederne (spot- og for-wardmarkedet) ud af balance.

Udenlandske investorer, der ikke er berettigede til udbytterefusion, søger at sælge deres aktier, inden udbyttet udloddes, for at købe dem tilbage fra markederne efter udlodningen. (Danske) aktionærer, der hellere vil realisere et resultat, der er skattepligtigt i henhold til aktieavancebeskatningsreglerne, end at modtage et aktieudbytte, søger ligeledes at sælge deres aktier til markedet inden udlodningen af udbyttet. Disse aktionærer vil eventuelt også købe aktier tilbage fra markedet efter udbyttedatoen. Og endelig er der rene spekulanter, der mener, at aktieprisen ikke falder, med netop det beløb der ud-betales i udbytte, som bringer aktier på marke- det lige inden udbyttedatoen. Alle disse grupper af in-vestorer forårsager bevægelser på markedet lige omkring udbyttedatoen. Disse bevægelser er ikke

identiske på spot- og forwardmarkedet. Prisen på spotmarkedet for en og samme aktie kan udvikle sig anderledes end prisen på forwardmarkedet. Derved opstår muligheden for en arbitrageforretning.

Den eneste grund til, at udyttearbitrage kaldes udbyttearbitrage, er, at denne arbitrageforretning foretages, netop når udlodningen af udbyttet bringer specielt store bevægelser ind i markedet.

Lignende arbitrageforretninger foretages hele året rundt, idet spot- og futuremarkedet ikke kun afviger fra hinanden omkring udbyttedatoen.

Skattestyrelsen interesserer sig dog kun for udbyttearbitrage, fordi denne foretages omkring udlodningsdatoen for udbyttet og derved udløser en udbytteindkomst for arbitrageuren med deraf følgende retskrav på refusion af indeholdt udbytteskat i henhold til de gældende regler herom.

Efter pensionsplanen allerede i sit 2. indlæg udførligt havde beskrevet udbyttearbitragen for Skattestyrelsen, var det Skattestyrelsen selv, der i styrelsens 2. indlæg af den 18. januar 2019 for første gang betegnede udbyttearbitrage som en "pengemaskine". Dette begreb er ikke pensionsplanernes, således som Skattestyrelsen igen påstår det i styrelsens sammenfattende indlæg i førersagerne af den 8. august 2019, afsnit 8.1.

Utroligt nok bliver Skattestyrelsen gennem samtlige indlæg ved med at benægte eksistensen af udbyttearbitrage (senest i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 4.3, side 26). Dette, til trods for den megen omtale denne investeringsstrategi har fået under betegnelsen "cum ex" ikke kun i dansk, men også i international presse, og den grundige undersøgelse foretaget af ESMA på foranledning af Europamentet, jf. Europaparlamentets forslag til beslutning om en fælles løsning fra november 2018, som her fremlægges som bilag 81. Da Skattestyrelsen den 9. august 2019 fremsendte sit sammenfattende indlæg i førersagerne, forelå ESMAs rapport om udbyttearbitrage allerede. Det hjælper derfor ikke Skattestyrelsens sag at benægte realiteterne.

Det vidner også kun om naivitet at tro, at det udelukkende er pensionsplanerne, der realiserer en gevinst ved udbyttearbitragen. Det er dog kun synligt for pensionsplanerne, hvilken gevinst de selv realiserede ved forretningen. Det er jo deres forretning. Pensionsplanerne kan umuligt redegøre for uafhængige tredjeparters forretningsmodeller og profit.

Pensionsplanerne skal naturligvis ikke dele deres gevinst med modparterne til aktielånet og forwarden. Det ville jo have betydet et illegalt samarbejde mellem disse uafhængige markedsdeltagere. Aktielåntager og forwardmodparten har forretningsmæssige interesser, der er modsat dem, som pensionsplanerne har. De samarbejder naturligvis ikke og deler ingen gevinst.

Efter så mange siders beskrivelser af udbyttearbitrage gennem de tidligere indlæg er det også ufatteligt, at Skattestyrelsen stadig ikke kan eller vil forstå pensionsplanernes rolle. Skattestyrelsen opremser i styrelsens indlæg af den 9. august 2019, afsnit 4.3, side 27, de forskellige aktører uden at forstå pensionsplanens rolle.

Således anføres partnerne, som følger:

| Part | Ydelse |
|---|---|
| Sælger | Leverer aktierne |
| Pensionsplanen | ? |
| Køber | Aftager aktierne. |
| Aktielåntager | Leverer finansiering. |
| Forward-køber/-sælger | Afdækker kursrisici. |
| Custodian | Indestår for solvens og gennemførsel af transaktioner. |

Hertil bemærker Skattestyrelsen:

> *"Som det fremgår, byder hver part – bortset fra pensionsplanen – efter det oplyste ind med noget, der er nødvendigt, for at transaktionerne kan gennemføres med det ønskede resultat. Det siger derfor sig selv, at alle parter skal have en del af for- tjenesten, før det giver mening for dem at indgå i arbitragefor- retningen. Ellers er der intet forretningsmæssigt rationale for dem for at deltage i dette set-up, der naturligvis medfører en række risici, f.eks. medkontrahenters misligholdelse og med- kontrahenters insolvens."*

Hvad Skattestyrelsen nægter at acceptere, er, at pensionsplanen er køberen af aktierne. Der er ingen grund til spørgsmålstegnet ud for pensionsplanen. Pensionsplanen er køberen af aktierne, da pensionsplanen netop råder over en gunstig skattestatus, som den anvender til at realisere sin gevinst.

De andre parters forretning er ikke udbyttearbitrage. Der er derfor heller ingen grund til, at de skulle have del i pensionsplanens udbyttearbitragegevinst. Det giver absolut ingen mening, at køberen og sælgeren at aktier eller køberen og sæl- gerne af en forwardkontrakt skulle dele gevinsten, der blev realiseret ved transaktionerne. Det gør købere og sælgere aldrig.

**2.4.2.9 Eksempler på transaktioner ved udbyttearbitrage**

Til illustration af økonomien i de af pensionsplanens gennemførte udbyttearbitrageforretninger gennemgås i det følgende en transaktion gennemført af pensionsplanen. Det drejer sig om købet af en post aktier i TDC A/S i 2015).

En gennemgang af alle pensionsplanens transaktioner ville vise, at pensionsplanen sommetider realiserede en gevinst på køb og salg af aktierne ligesom i enhver anden investering i spekulationsøjemed. Sommetider blev gevinsten derimod realiseret på forward hedgen. Her virkede hedgen netop efter hensigten: modvirke tabene på selve aktietransaktionen. At gevinsten opstod på så forskellig vis, er netop dokumentation for realiteten af transaktionerne, og for at de på ingen måde var centralt organiseret eller styret.

Appendix 1 viser ligeledes en oversigt over samtlige aktietransaktioner, som pensionsplanen gennemførte. Det fremgår heraf, hvordan det varierer, hvor gevinsten realiseres: på aktiehandlen eller forward hedgen. Dette er typisk for udbyttearbitragetransaktioner.

En udbyttearbitragetransaktion kan opdeles i tre transaktioner: en aktiehandel, en forwardkontrakt og et aktieudlån.

Køb/salg af aktier og forwardkontrakten:

Pensionsplanen afgav den 5. marts 2015 en købsordre på 2.358.808 TDC A/S aktier til en pris på kr. 54,00 pr. aktie, i alt kr. 127.375.632,00. Betaling, levering af aktier og registrering var fastsat til at ske den 10. marts 2015. Idet købet indgås, samme dato som udlodningen af udbyttet besluttes, markeres handlen i clearing- systemet som en såkaldt "cum ex trade". Dette markerer over for de involverede custodians, at der efter afviklingen af aktiehandlen skal realiseres en market claim. Dette sikrer, at der ikke er to personer, der begge modtager udbyttet, modtager en DCA og derved kan anmode om refusion.

Pensionsplanen indgik – ligeledes den 5. marts 2015 – en forwardkontrakt (en finansiel kontrakt) vedrørende salg af 2.358.808 TDC A/S aktier til en pris på kr. 53,00 pr. aktie til afvikling den 19. juni 2015.

Pensionsplanen indgik den 2. juni 2015 en ny forwardkontrakt med samme afviklingsdag, nemlig den 19. juni 2015 vedrørende køb af 2.358.808 TDC A/S aktier til en pris på kr. 49,68 pr. aktie. Den lukkede derfor den åbne position og havde en samlet <u>gevinst på forwarden</u> på kr. 3,56 pr. aktie.

Den 2. juni 2015 solgte pensionsplanen aktierne med valutadato den 4. juni 2015 til en pris på kr. 49,69 pr. aktie, i alt kr. 117.209.169,52. Pensionsplanen havde således et nettotab på kr. -4,31 pr. aktie, i alt kr. -10.166.462,48.

Aktiehandlerne og forwardkontrakterne gav tilsammen et samlet tab på kr. 0,75 pr. aktie, i alt et tab på kr. 1.774.059,50.

Aktieudlånet

Den 9. marts 2015 afgav pensionsplanen en ordre til afvikling den 10. marts 2015 om at udlåne 2.358.808 TDC A/S aktier mod kontant sikkerhedsstillelse af kr. 54,00 pr. aktie, i alt kr. 127.375.632,00. Pensionsplanen modtog således kr. 127.375.632,00 som sikkerhed for at få aktierne tilbage.

Aktieudlånet blev den 2. juni 2015 sagt op med valutadato den 4. juni 2015. Dette havde den konsekvens, at aktierne skulle leveres tilbage. Aktierne havde da en markedsværdi på kr. 49,69 pr. aktie, i alt kr. 117.209.169,52.

Dette beløb samt det samlede beløb af den løbende regulering af værdiansættelsen, MTM, som udgjorde kr. -10.166.462,48 skulle tilbagebetales til aktielåntager, i alt kr. 127.375.632,00.

Dermed var aktielåntageren sikret at modtage det fulde beløb, som han havde stillet i kontant sikkerhed for aktielånet.

Herudover skulle pensionsplanen betale rente på aktieudlånet på kr. -213.000,36 samt modtage gebyr for aktieudlånet på kr. 265.130,02, i alt betale netto kr. 52.129,66.

Udbytte og refusionsbetalingen

Interimudbyttet var blevet vedtaget den 5. marts 2015.

Aktierne blev handlet uden udbytte fra den 6. marts 2015 (ex-dato).

Pay day, dvs. dagen hvor udbyttet udbetales, var den 10. marts 2015.

Pensionsplanen modtog nettoudbyttet i form af en market claim, idet sælger af aktierne stadig var registreret som ejer af aktierne på record day. Pensionsplanene var på record day (den 9. marts 2015) endnu ikke registreret som ejer af aktien, da afviklingen af købet først skete den 10. marts 2015. Record day er i Danmark dagen før pay day. VP Securities udbetalte derfor umiddelbart udbyttet til den tidligere ejer, der stadig var registreret som ejer af aktien hos VP Securities, den 9. marts 2015. I henhold til den såkaldte "market claim proces" er sælgerens custodian forpligtet til at debitere udbyttet fra sælger og kreditere udbyttet hos køber (el- ler sende udbyttet videre til købers custodian, så han kan kreditere købers konto). Det er således køberen af aktierne, der modtager udbyttet og er refusionsberettiget.

Bruttoudbyttet betalt af TDC A/S var kr. 1,00, i alt kr. 2.358.808,00 for pensionsplanens aktier.

Heraf udgjorde nettoudbyttet kr. 1.721.929,84 og udbytteskatten kr. 636.878,16.

Betalingen af disse to beløb til pensionsplanen udlignede blot tabet, som pensionsplanen havde på ex-datoen, da aktierne på denne dato mistede det tilsvarende beløb i værdi. Refusionen var således ikke drivkraften til investeringerne i de danske aktier. Grunden til at investere i de danske aktier var prisforskellen på spot- og forwardmarkedet, der var udløst af udlodningen af et udbytte.

### 3 PENSIONSPLANEN BLEV DEN CIVILRETLIGT OG SKATTEMÆSSIGT RETMÆSSIGE EJER AF AKTIERNE

#### 3.1 Pensionsplanen blev den civilretlige ejer af aktierne

Som udgangspunkt gælder principielt, at skatteretten styres af civilretten. Dette gælder tillige i forhold til spørgsmålet om opnåelse af ejendomsret til aktier.

Det er et grundlæggende obligationsretligt princip i dansk ret, at ejerskab til et givent aktiv opnås, når der er indgået en endelig og bindende aftale mellem parterne, som er juridisk gyldig. Dette princip gælder også for erhvervelse af aktier.

Ejerskabet erhverves, uanset om køberen måtte misligholde forpligtelsen til at betale købesummen. Af samme grund findes der regler om, at sælger efterfølgende kan hæve salget, hvis der ikke sker betaling af den aftalte købesum, medmindre der alene mangler at blive betalt et uvæsentligt beløb. Disse regler om efterfølgende ophævelse af et salg, hvis ikke køber betaler købesummen, illustrerer med al tydelighed, at betaling af købesummen ikke er en forudsætning for ejendomsrettens overgang. I givet fald ville det ikke være nødvendigt med regler om efterfølgende ophævelse af handlen, i de tilfælde hvor køber ikke betaler den aftalte købesum.

Da betalingen af købesummen ikke er en betingelse for at erhverve ejerskab, leveres aktier (i afviklingsprocessen kaldet settlement), først når betalingen sker (i henhold til princippet "Payment versus Delivery" – DvP).

Konsekvensen heraf er, at:

- <u>Settlement</u> af en aktiehandel, som sker hos clearing- og settlement- agenten, er ikke en forudsætning for at erhverve ejerskab af en aktie.
- Dokumentation af en <u>pengestrøm</u> fra køber til sælger er ikke dokumentation for, at en køber har erhvervet ejerskab til en dansk aktie.
- Dokumentation for <u>overdragelse</u> af en aktie fra sælgers <u>til købers depot</u> er ikke dokumentation for, at en køber har erhvervet ejerskab til en dansk aktie.
- Køberen af en aktie er ejer, allerede <u>inden aktien registreres</u> i hans depot.

- Sælges en aktie, så kort inden udbyttedatoen at aktien endnu ikke er registreret i køberens depot, bliver udbyttet udbetalt til den forkerte via VP Securities og de underliggende subcustodians. Det er med baggrund heri, at købelovens § 19, stk. 1, erklærer køberen af en aktie berettiget til modtagelsen af udbyttet (og dermed til refusion).

I overensstemmelse hermed fastholder bemærkningerne til aktieavancebeskatningslovens § 23 (L78 af den 16. november 2005, jf. bilag 12) således også:

> *"Det afgørende for fastlæggelse af afståelsestidspunktet er, hvornår der foreligger en endelig og bindende aftale om afståelsen. For aktier, der er handlet på børsen, vil det være børsnotaens dato (handelsdatoen) der lægges til grund.*
>
> *Derudover kan fastlæggelsen af erhvervelsestidspunktet have en betydning, f.eks i forbindelse med ny lovgivning. Også her er det afgørende, hvornår der foreligger en endelig og bindende aftale om erhvervelsen. For aktier, der er handlet på børsen, vil det være børsnotaens dato (handelsdatoen), der lægges til grund".*

Tilsvarende er anført i Den juridiske vejledning, afsnit C.B.2.1.6.1.

Handelsdatoen for en børsnoteret aktie er således det tidspunkt, hvor købs- og salgsordre "matches". Denne matching af købs- og salgsordre – der sker ved et automatiseret "hand shake" på moderne automatiserede handelsfaciliteter – betegnes som "gennemførelsen af handlen".

Også Skatterådet lader ingen tvivl om, at det civilretlige ejerskab erhverves på handelsdatoen, som netop ikke er afviklingsdatoen, idet det i afgørelsen af den 20. marts 2007 (SKM2008.831.SR) fastholdes, at handelsdatoen ligger efter afgivelsen af en ordre på køb af aktier, men før afviklingen af transaktionen:

> *"En bestilling kan ikke sidestilles med et køb […]*
>
> *[…] det er handelsdatoen, der skal lægges til grund ved fastsættelsen tidspunktet, for køb eller salg af aktier. Valørdatoen er således ikke afgørende. […] Det gælder, uanset at valørdatoen først er den 4.1.2006 og uanset at aktierne derfor ikke var med i spørgerens depot pr 31.12.2005)"*

Det er dermed på den ene side klart, at en købsordre ikke er nok til at blive ejer af en aktie. På den anden side er det på samme måde klart, at købet endnu ikke behøver at være afviklet ved bogføring på køberens depotkonto. Betaling af aktierne er derfor heller ikke nødvendig for at blive ejer af aktierne, idet købsprisen for aktierne først skal betales ved levering (delivery versus payment), jf. værdipapirhandelslovens § 72/kapitalmarkedslovens § 188, dvs. ved bogføring af aktierne på køberens depotkonto.

Pensionsplanen har i den foreliggende sag afgivet en købsordre til sine brokere om køb af aktier. Disse ordrer blev matchet med salgsordrer, der kom fra andre brokere. Denne matching er selve købsaftalen, der er endelig og bindende. Betalingen og registreringen af aktierne, der bekræfter, at aftalen var endelig og bindende, skete tre til fire dage senere.

Det kan ved sagens afgørelse således lægges til grund, at pensionsplanen var civilretlige ejere af de i sagerne omhandlede aktier.

Af dette civilretlige ejerskab følger ligeledes skattemæssigt retmæssigt ejerskab, såfremt der ikke foreligger en af de af retspraksis udviklede undtagelser.

Retspraksis har især i forbindelse med aktielån fastholdt, at aktielåntager bliver den civilretlige ejer af aktien, men ikke den skatteretligt retmæssige ejer af aktien. Aktielångiver fortsætter med at være den skattemæssigt retmæssige ejer af aktien, helt indtil aktien sælges af aktielåntager til en tredjemand.

På udbyttedatoen havde pensionsplanen ikke lånt aktierne ud. Udlånet skete først tre til fire senere. Om aktielåntager efterfølgende lånte aktierne ud, beholdt dem eller solgte dem videre til en tredjemand, kan pensionsplanen ikke vide. Pensionsplanen blev derfor ved med at være den skattemæssigt retmæssige ejer af aktierne, selvom der tre-fire dage senere fulgte et aktieudlån.

At forwardkontrakten blev indgået, samme dag som aktierne blev købt, medfører ligeledes ikke, at pensionsplanen mistede det skattemæssigt retmæssige ejerskab til aktierne.

**3.2 Handel med store aktieposter – shortselling**

Skattestyrelsen mener i det sammenfattende indlæg til førersagerne af den 9. august 2019, afsnit 4.1, side 22-24, at der er handlet urealistisk store aktieposter, og at pensionsplanerne af den grund umuligt kan have været ejere af de omtalte aktier. Styrelsen mener, at det skulle være umuligt at erhverve så store aktieposter på en enkelt dag. Som eksempel herfor angiver styrelsen et salg af aktier for kr. 3,9 mia., som blev solgt gennem accelereret bookbuilding – ikke på det fri marked.

Styrelsen bemærker således ganske rigtigt, at store aktieposter netop ikke handles på børsen. Til store aktieposter søges alternative markeder OTC.

Ville Skattestyrelsen foretage en lignende analyse af alle handler foretaget fx af Danske Bank, Deutsche Bank, Citibank eller Blackrock, ville skattestyrelsen nå frem til lignende store handler med aktier. Der handles hver dag af alle store aktører på markedet ufatteligt store aktieposter.

Da det ganske rigtigt kan være svært at skaffe store aktieposter, er det evident, at der blandt de aktier, som pensionsplanerne købte, logisk nok må have været en del aktier solgt af short sellere. Hvilke og hvor mange aktier der kom fra long ownere eller short sellere, er umuligt at sige. Men det gælder for enhver køber af aktier. Ingen kan vide, hvem han køber en aktie af. Hverken ved børshandler eller ved OTC-handler.

**3.2.1 Introduktion til short selling**

Short selling er ikke lovreguleret i Danmark med undtagelse af reglerne om forbud mod udækket short selling og enkelte flagningsregler.

Ifølge notat af den 10. april 2018 fra Finanstilsynet vedrørende short selling i Danmark, der fremlægges som bilag 82, betyder short selling i henhold til Finanstilsynets egen definition, , salg af en aktie, som sælger ikke ejer på salgstidspunktet, i modsætning til en almindelig værdipapirhandel, hvor sælgeren ejer det værdipapir, som sælges.

Det er internationalt anerkendt, at en short seller betragtes som dækket, hvis han blot har en rammeaftale om aktielån på plads, på det tidspunkt hvor han sælger de aktier, han ikke ejer. En sådan rammeaftale er en GMSLA. Den, der ønsker at sælge aktier, han ikke ejer, skal ved en rammeaftale om aktielån blot sikre sig at kunne levere aktierne på leveringstidspunktet. I short selling-branchen tales herved også om en "lokaliseringsaftale": Short selleren skal være i stand til at lokalisere de aktier, som dækker hans salg, så han kan levere på afregningstidspunktet. For at udtrykke det med Finanstilsynets ord, jf. bilag 82, side 2, så skal en short seller

> *"altså før salget have været i stand til at låne papiret eller på tilsvarende vis sikret sig at kunne få overført ejerskab til papiret."*

"At være i stand" til at låne er netop ikke det samme som allerede at have lånt. Derfor taler Finanstilsynet om, at short selleren blot skal sikre sig, at han kan overføre ejerskab.

Short selleren skal med andre ord ikke indgå en **konkret** aftale om lån af et bestemt antal aktier, inden salget foretages, sådan som Skattestyrelsen postulerer i indlægget af den 9. august 2019, idet en sådan aftale ville gøre "short selleren" til den civilretlige ejer af aktien. Han ville dermed slet ikke være short seller længre, men en "long owner seller." Short selling kan derfor (legalt) kun forekomme i form af salg under rammeaftaler om aktielån (medmindre der er tale om short selling foretaget af såkaldte "market makere" – banker autoriseret til at foretage udækket short selling).

Idet en short seller blot skal være dækket i form af indgåelse af en rammeaftale om aktielån, har short selling den konsekvens, at en short seller øger antallet af aktier i handel, og dermed antallet af aktier som indgås endelige og bindende aftaler om køb af. Alle køberne af disse aktier bliver i henhold til obligationsrettens almindelige regler ejere af de erhvervede aktier.

Finanstilsynet fremhæver således også i bilag 82, side 6:

> *"Tilsvarende gør short selling det muligt for market makere at tilbyde deres kunder (detailkunder såvel som institutionelle kunder) at købe et værdipapir, selvom om **market makeren ikke kan skaffe papiret** fra sin egenbeholdning eller via markedet **på tidspunktet for kundens ordre**.* " (vores fremhævning)

Short sellere kan i praksis sælge et ubegrænset antal aktier, så længe de blot har lokaliseringsaftaler om aktielån (GMSLA'er), der gør det muligt for dem at levere de solgte aktier. Således var værdien af korte positioner i danske børsnoterede aktier i starten af 2018 ca. kr. 25 mia. svarende til ca. 1 pct. af den samlede værdi af det danske noterede aktiemarked. Og disse tal omfatter kun korte positioner, der hver især har været indberetningspligtige. Har de ultimative sælgere af aktierne, som blev solgt til pensionsplanerne, delvist været short sellere, behøver de ikke nødvendigvis at dukke op i disse statistikker, hvis hver short sellers nettoposition ikke oversteg 0,2 pct. af den af selskabet udstedte aktiekapital.

**Figur 3: Værdien af korte nettopositioner i danske børsnoterede aktier er seksdoblet siden 2013**

Note: Figuren viser markedsværdien i danske kroner af udestående korte nettopositioner over 0,2 pct. af den udstedte aktiekapital i danske børsnoterede aktier fordelt på udstederselskabets sektor samt den relative størrelse ift. det samlede marked. Sektorfordelingen er bestemt ud fra GICS-koder.

Kilde: Finanstilsynet.

Ingen kan skelne mellem aktier solgt af en short seller og aktier solgt af en reel aktieejer (long owner). Det tilgængelige antal aktier i handel stiger dermed ved short selling (midlertidigt) til et antal over 100 pct. af de udstedte aktier. Det er først ved afviklingen (settlement) af aktiehandlerne, at dette overskydende antal aktier i handel bringes tilbage til det reelle antal aktier udstedt af selskabet. Den samlede mængde af dematerialiserede aktier vil altid være korrekt på afviklingstidspunktet, når short selleren skal levere de solgte aktier, idet han trækker aktier under aktielånet eller foretager et inddækningskøb på markedet.

Det er således muligt, at der handles flere danske aktier på markedet, end det an- tal der oprindeligt blev udstedt af selskaberne. Short selling har netop den typiske – og tillige **ofte af centralbanker og finanstilsyn ønskede (jf. Finanstilsynets rapport on short selling, jf. bilag 82, side 5-6)** – konsekvens, at der er flere aktier til rådighed på markedet, end der oprindeligt er udstedt.

Overdragelsen af *ejerskab* er i henhold til dansk lovgivning fuldstændigt adskilt fra afviklingen af en aktiehandel. Det er tilmed irrelevant for spørgsmålet om ejerskab, om (1) en aktiehandel afvikles "fysisk" (ved en "de-registrering" af sælger og en "registrering" af køber ved VP Securities eller et andet

depotinstitut), eller om handlen (2) afvikles ved brug af netting (med den konsekvens, at der eventuelt slet ikke sendes en nettorapport til VP Securities – hvis nettoresultatet er 0).

**3.2.2 Short selling skaber flere aktier, indtil handlerne bliver afviklet (settlement)**

Når en short seller sælger aktier under en rammeaftale om aktielån (GMSLA), skaber han enten flere aktier, end selskabet har udstedt, eller udtrykt anderledes opstår der dobbelt ejerskab til en og samme aktie: Aktielångiveren, der endnu ikke har lånt aktien ud under en konkret aftale om aktielån (men kun har indgået en rammeaftale om et potentielt udlån) er stadig civilretlig ejer af aktien. Samtidig erhverver køberen civilretligt ejerskab af en aktie ved den endelige og bindende aftale med short selleren.

Det er først ved afviklingen af handlerne (der i reglen sker, to dage efter handlen er indgået ved en endelig og bindende aftale), at antallet af ejere bringes tilbage til antallet af aktier, der er udstedt af selskabet, da der ikke kan registreres mere end én ejer af samme aktie. Det er dette faktum, vi har forsøgt at skitsere med følgende illustration.

Illustrationen viser en kunstig verden hvor et selskab kun at udstedt en enkelt aktie. Dermed kan ejeren kun sælge en enkelt aktie.

Illustrationen viser dog 3 short sellers, der bringer det samlede antal af aktier i omløb op til 4 aktier, selv om der kun kan leveres en enkelt aktie. Handlet bliver alligevel 4 aktier.

I den her illustrerede situation er der flere aktier der bliver genstand for en endelig og bindende aftale om køb af aktier, og der er således fire købere der bliver ejere af aktierne selv om der kun er en der kan få aktien leveret. Der opstår således en temporær "inflation" af aktier, som Unidroit udtrykker det, på handelsdatoen som igen forsvinder på afviklingsdatoen.



Det er således kun indtil afviklingen af aktiehandlerne, at der eksisterer flere ejere af danske aktier, end svarende til det antal aktier selskaberne har udstedt. Da der ikke "fysisk" kan leveres flere aktier, end selskabet har udstedt, må det dobbelte midlertidige ejerskab skabt af short selleren ophøre, når aktierne skal leveres ved elektroniske bogføringer (posteringer/registreringer) hos den eller de involverede custodians. Om afvikling under anvendelse af netting kan føre til en forlængelse af det dobbelte ejerskab ud over tidspunktet for afviklingen, behøves ikke diskuteres her, da pensionsplanen lånte aktierne ud, på det tidspunkt hvor aktiekøbene skulle afvikles for at kunne betale købsprisen. Pensionsplanens civilretlige ejerskab ophørte derfor også med afviklingen af aktiekøbet, i henhold til den aktieudlånsaftale de indgik pr. e-mail. På udbyttedatoen havde pensionsplanen dog civilretligt ejerskab til aktierne, hvorfor den også var rette indkomstmodtagere af udbyttet, med den konsekvens at den havde retskrav på at modtage refusion af indeholdt udbytteskat i henhold til dagældende regler herom.

Hvilke aktier, der har mere end én civilretlig ejer, kan ikke identificeres, idet short sellere agerer under en eller flere rammeaftaler om aktieudlån. Rammeaftalerne (GMSLA'er) om aktielån indgås ofte mellem (long owner-)aktionærer og mellemmænd for aktielån (stock loan intermediaries) på den ene side og short sellere og stock loan intermediaries på den anden side. Aktionæren, der låner sin aktie ud, kender derfor ikke nødvendigvis short selleren. Aktielångiver, der stiller sin aktie til rådighed for et potentielt eller konkret udlån, kender heller ikke den ultimative aktielåntager og dennes motivation og ved langt mindre, om den ultimative låntager overhovedet er en short seller.

Short selleren trækker kun på rammeaftalen (GMSLA) – ofte blot ved e-mails, der fastholder de konkrete betingelser for det konkrete aktielån – *hvis* og *når* han skal levere aktierne under clearing- og settlement-processen. Hvis short selleren køber aktier fra markedet igen, inden han skal levere de aktier, han oprindeligt solgte, og han aftaler en kortere leveringstid for aktiekøbet end for aktiesalget (ved OTC-for- retninger kan leveringsfristen aftales frit), behøver short selleren aldrig at trække nogen aktier under GMSLA. Han har ikke desto mindre overdraget ejerskab til ak- tier til en køber.