# Exhibit 41

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 1

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2                CASE NO.  18-MD-2865 (LAK)

3     _____
                                             )
4     IN RE:                                 )
                                             )
5     CUSTOMS AND TAX ADMINISTRATION OF      )
      THE KINGDOM OF DENMARK                 )
6     (SKATTEFORVALTNINGEN) TAX REFUND       )
      SCHEME LITIGATION                      )
7                                            )
                                             )
      This document relates to case nos.     )
8     19-cv-01783; 19-cv-01788; 19-cv-01794; )
      19-cv-01798; 19-cv-01918               )
9     _____)

10

11

12              C O N F I D E N T I A L

13            SUBJECT TO THE PROTECTIVE ORDER

14

15

16     REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                    EXAMINATION OF

18                  RICHARD MARKOWITZ

19                 DATE: April 8, 2021

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 13

1    R I C H A R D  M A R K O W I T Z,
2         called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
5
6
7    EXAMINATION BY MR. WEINSTEIN:
8         Q    Good morning, Mr. Markowitz.
9              MR. BONGIORNO:  Marc, before we get
10        going, I just wanted to mention that
11        Mr. Markowitz is diabetic and we're
12        going to have to just keep a close eye
13        on his levels.  So every, I don't know,
14        45, 50, 55 minutes or so, we're just
15        going to ask that he check it, see
16        whether or not he needs a break or a
17        snack or anything.  But I didn't want
18        to -- I'm obviously trying to do it in a
19        way that doesn't interrupt the flow of
20        the deposition.  I just wanted to let
21        you know.
22             MR. WEINSTEIN:  Right.  Thank you.
23        I appreciate that, and we'll accommodate
24        any needs there.
25        Q    Mr. Markowitz, my name is Marc

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 137

```
 1              And ultimately they didn't find you
 2      another leverage provider?
 3              MR. BONGIORNO:  Objection.
 4         A    I disagree with the premise of your
 5      question.
 6         Q    Okay.  Ultimately, were they able
 7      to provide -- to find another leverage
 8      provider?
 9         A    No.
10         Q    Can you turn, please, to
11      Exhibit 2116?
12              MR. WEINSTEIN:  Mark this as 2116.
13              (Whereupon the above mentioned was
14         marked for Identification.)
15              MR. BONGIORNO:  Marc, maybe after
16         you finish with this one, we can take
17         our next break?
18              MR. WEINSTEIN:  Yeah.
19         Q    So Mr. Shah sends you an e-mail in
20      April of 2012 asking if you have a pension
21      fund in the U.S. that can be used for trading
22      equities and derivatives.
23              Do you recall receiving that from
24      him?
25         A    Yes.
```

```
 1        Q    At the time that you got it, did
 2   you have a pension fund in the U.S. that
 3   could be used for trading equities and
 4   derivatives?
 5        A    I don't recall.
 6        Q    Okay.  Did you understand that this
 7   question was in the context of dividend --
 8   the dividend arbitrage strategy?
 9        A    Yes.
10        Q    Do you recall what your response
11   was to Mr. Shah?
12        A    No.
13        Q    Did you end up setting up a pension
14   fund in the U.S. to be used for trading
15   equities or derivatives as part of a dividend
16   arbitrage strategy?
17        A    Yes.
18        Q    Okay.  And what pension plans did
19   you set up to be used for that purpose?
20        A    RJM Capital Pension Plan, among
21   others.
22        Q    When was RJM Capital Pension Plan
23   established?
24        A    Sometime in 2013.
25        Q    Okay.  Did -- along with your
```

1    brokers were going to go find the liquidity
2    for these trades in the marketplace?
3         A    From sellers of shares.
4         Q    Okay.  Where did you expect they
5    were going to find these sellers?
6         A    In all the dividend arbitrage
7    strategies we had looked at and participated
8    in, that was up to the brokers to find that
9    liquidity, given the economics of the trade
10   and the advantage of dividend arbitrage.
11            As I said, profitability could be
12   shared.  The sellers could have been other
13   investors who were not entitled to the tax
14   benefits.  They could have been short
15   sellers, long sellers.
16            So the source of the stock was up
17   to the brokers and the sellers to obtain
18   based on market liquidity.
19        Q    Okay.  And was it your
20   understanding that the sellers in each case
21   would be executing on the Solo platform?
22        A    We were informed by Solo that other
23   counterparty to the trade would likely be
24   customers of Solo as well.
25        Q    Okay.  And is that -- that's true

1      for the sellers of the shares?
2           A    Yes.
3           Q    Okay.  And so was it your
4      understanding that the sellers of the shares
5      were going to be customers of Solo?
6           A    Yes.
7           Q    Was that also true for the forward
8      or future counterparties?
9           A    Yes and no.
10          Q    Yeah, let me withdraw that.
11               Was that going to be true with
12     respect to the forward counterparties?
13          A    Yes.
14          Q    Okay.  Was that also going to be
15     true with respect to the stock lending
16     counterparties?
17          A    Yes.
18          Q    Okay.  And so, when you say the
19     brokers were going to go out into the market,
20     the market that they were going to go into
21     was the Solo customer list.
22               Correct?
23          A    Again, they could have gone to the
24     Solo customers or other customers if they
25     wanted to.  There was no limit placed.

1    plan get the seller his or her 50 percent
2    profit on the deal?
3        A    Again, the plan didn't pay the
4    money to the seller.  The plan paid the money
5    or a fee, as was previously negotiated, to a
6    company called Ganymede Investments, I
7    believe, and would have received an invoice
8    for that.
9             And it was up to Ganymede to
10   distribute those funds, if needed, to other
11   counterparties.
12       Q    What was Ganymede?
13       A    A company.
14       Q    Okay.  Was it a company that you
15   had ever heard of prior to starting this
16   dividend arbitrage trading strategy with Solo
17   Capital?
18       A    No.
19       Q    Okay.  Did you do any due diligence
20   on Ganymede prior to doing any transactions
21   with it?
22       A    Patriot Act, AML, and basic
23   information on the owners of the company.
24       Q    Okay.  What information did you
25   obtain on the owners of the company,

```
 1    Ganymede?
 2         A    I believe it was owned by Sanjay
 3    Shah.
 4         Q    Okay.  And so Mr. Shah told you
 5    that?
 6         A    We might have received corporate
 7    documents that -- from wherever the company
 8    was incorporated that showed that.
 9         Q    Okay.  Do you know if you actually
10    did that, or did you just hear from Mr. Shah
11    that he owned it?
12         A    I don't recall which one it was at
13    this point.
14         Q    Okay.  What -- did Ganymede provide
15    services to any of the pension plans that you
16    were affiliated with?
17         A    The services would have been
18    assistance in the overall transaction, I
19    think, from our perspective, as I explained,
20    the amount of sharing of profit from the
21    trades and fees to Solo, similar to the
22    Merrill Lynch trade.  Those would be paid to
23    an entity designated by Solo.
24              And they designated Ganymede, and
25    it was up to that entity and Solo to decide
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 202

1  how those fees would be parceled out.  But it
2  was part of the overall construction of the
3  trade.
4       Q   Okay.  Other than facilitating
5  getting the money to the right places, did
6  Ganymede, the entity, provide services to the
7  pension plans?
8       A   I viewed Ganymede and Solo and
9  Sanjay Shah as one entity.  So yes, in my
10 belief, there were significant services
11 provided in developing and becoming a
12 custodian at Solo Capital, and hiring all the
13 staff necessary to allow the custodian to
14 function, and to allow our pension plans or
15 other pension plans to execute these trades.
16      Q   Okay.  So you viewed Solo Capital
17 and Ganymede as interchangeable?
18      A   Yes.
19      Q   Okay.  And do you -- did you have
20 an understanding as to why you got an
21 instruction from Mr. Shah to use the Ganymede
22 entity on certain occasions as opposed to the
23 Solo Capital entity?
24      A   No.
25      Q   Okay.  Solo Capital had operations

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 211

1    to this agreement, you were agreeing to pay
2    Ganymede 66.67 percent -- I'm not even sure I
3    said that right.
4            Pursuant to this agreement, you
5    were agreeing to pay Ganymede 66.67 percent
6    of that refund amount that's in the schedule,
7    but minus the Acupay fee.
8            Correct?
9        A   My understanding was that the
10   pension plan was entitled to 50 percent, the
11   other 50 to the seller, and we would pay to
12   Solo or its designee a 34 percent fee similar
13   to the arrangements we had at Broadgate.
14           The net result to the pension plan
15   is to retain approximately 34 percent of the
16   reclaim.  That's our understanding of any
17   fees that were paid.
18           It starts with a 50/50 split with
19   the seller.
20       Q   Okay.  I'm just asking what -- what
21   this agreement says.  And the agreement that
22   you signed with Ganymede was that the plan
23   would pay Ganymede 66.67 percent of that
24   refund amount in schedule -- in the schedule,
25   except that deducted from that refund amount

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3    _____
                                             )
 4    IN RE:                                 )
                                             )
 5    CUSTOMS AND TAX ADMINISTRATION OF      )
      THE KINGDOM OF DENMARK                 )
 6    (SKATTEFORVALTNINGEN) TAX REFUND       )
      SCHEME LITIGATION                      )
 7                                           )
      This document relates to case nos.     )
 8    19-cv-01783; 19-cv-01788; 19-cv-01794; )
      19-cv-01798; 19-cv-01918               )
 9    _____)

10

11

12                C O N F I D E N T I A L

13            SUBJECT TO THE PROTECTIVE ORDER

14

15

16    CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

17                 ORAL EXAMINATION OF

18                  RICHARD MARKOWITZ

19                      VOLUME II

20                  DATE: April 9, 2021

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 317

```
1    R I C H A R D  M A R K O W I T Z,
2           called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
     CONTINUED EXAMINATION BY MR. WEINSTEIN:
5
6         Q    Mr. Markowitz, if you can turn to
7    Exhibit 2133, please?
8              Did each of the partnerships listed
9    in this exhibit earn profits from the Danish
10   dividend arbitrage strategy?
11        A    (Witness reviewing.)
12             MR. BONGIORNO:  Objection.
13        A    I don't recall.
14        Q    Did the partnerships earn profits
15   from any other investing activity other than
16   the Danish dividend arbitrage strategy?
17        A    Yes.
18        Q    What other investment strategies
19   did these partnerships earn money from?
20        A    Dividend arbitrage investments.
21        Q    So their profits were generated
22   entirely by dividend arbitrage strategies?
23        A    Yes.
24        Q    Did those strategies involve
25   Denmark and Belgium?
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 354

```
 1      can establish pension plans to participate in
 2      the dividend arbitrage strategy?
 3           A    No.
 4           Q    Okay.  So you had thoughts that you
 5      would do business using the LLCs.
 6                Right?
 7           A    That is certainly one function of
 8      those LLCs.
 9           Q    Okay.  And how many LLCs were you
10      intending to have set up?
11           A    At the time, in discussions with
12      Solo Capital about market liquidity and
13      capacity, and to spread that liquidity in our
14      allocation among our allocation of the market
15      liquidity among clients, I think we were
16      intending somewhere between 30 and 40 pension
17      plans would be established.
18           Q    Okay.  But the number of pension
19      plans and LLCs that would be set up were
20      based on what Sanjay Shah and Solo told you
21      would be a market allocation for the dividend
22      arbitrage strategy?
23           A    No.  The overall allocation would
24      be indicated to us or forecasted.  It was up
25      to us to decide if we wanted to spread that
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 369

```
1      opportunity to two additional individuals.
2           Q    Okay.  And those are Ms. Jones and
3      Mr. Herman?
4           A    Yes.
5           Q    Okay.  And they are related to you?
6                MR. BONGIORNO:  Objection.
7           A    Yes.
8           Q    So after Mr. -- after Solo Capital
9      informed you that there was additional
10     capacity for the trading, LLCs and pension
11     plans were set up for Ms. Jones and
12     Mr. Herman?
13          A    Yes.
14          Q    And did they each have three LLCs
15     and pension plans set up?
16          A    Yes.
17          Q    Okay.  So, ultimately, there was a
18     group of 40 plans that were trading using
19     this strategy.
20               Is that right?
21          A    Yes.
22          Q    Were -- three of the new plans that
23     were set up were set up on your behalf.
24               Is that right?
25          A    Yes.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 379

```
1      that role?
2           A    I don't recall.
3           Q    Well, did Mr. Ben-Jacob -- well,
4      withdrawn.
5                Did Kaye Scholer assist with the
6      establishment of the new LLCs and pension
7      plans?
8           A    Yes.
9           Q    Okay.  And was that true for all 40
10     of the new LLCs and pension plans?
11          A    No.
12          Q    And not all of them were new.
13               Is that correct?
14          A    Yes.
15          Q    Okay.  So, of the 40 LLCs and
16     pension plans, for those that were newly
17     established in 2014, did Kaye Scholer assist
18     in establishing them?
19          A    Yes.
20          Q    Was it your understanding that each
21     of the plan participants for those new
22     pension plans signed a similar limited power
23     of attorney granting Mr. Ben-Jacob the power
24     to do the same things?
25          A    I don't recall.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 451

| | |
|---|---|
| 1 | A    We received advice that explained |
| 2 | the issues surrounding that related to a |
| 3 | different jurisdiction in Denmark, and that |
| 4 | it created additional tax risk for the |
| 5 | pension plans. |
| 6 | Q    Okay.  Can you turn, please, to |
| 7 | Exhibit 1829? |
| 8 | MR. BONGIORNO:  Day 1, Volume 1. |
| 9 | Q    This e-mail from you is about |
| 10 | Danish reclaim payments received from Syntax. |
| 11 | Is that right? |
| 12 | A    Yes. |
| 13 | Q    And you say in the e-mail that "the |
| 14 | amounts on the spreadsheet were sent to each |
| 15 | plan's respective custodian, and then |
| 16 | 75 percent of the gross reclaim was paid out |
| 17 | to Ganymede." |
| 18 | And in 2015, why was 75 percent of |
| 19 | the gross reclaim paid out to Ganymede? |
| 20 | A    In late 2014, after the partners of |
| 21 | Argre decided not to work together, we |
| 22 | weren't sure we would be able to continue |
| 23 | doing business with Solo Capital or its |
| 24 | related entities. |
| 25 | And as I mentioned, two of my |

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 452

1  former partners, Mr. Stein and Mr. Lhote, had
2  decided to go off and do business on their
3  own.  And they had acquired North Channel
4  Bank, got authorizations to have it act as a
5  custodian, had decided to work with former
6  employees of Solo, and were going to be
7  effectively competing in this dividend
8  arbitrage marketplace.
9         So with respect to Solo Capital,
10 where Mr. Van Merkensteijn and myself, and
11 ultimately Mr. Klugman, preferred to continue
12 our relationship and client business, we had
13 discussions that initially were tense because
14 Mr. Shah thought that Mr. Van Merkensteijn
15 and myself were investors in the bank, aware
16 of the developments, were going to be
17 competing.
18        And we assured them that that was
19 farthest from the truth.  We had no
20 relationship with that, we're not aware of
21 it, or became aware of it at the time that
22 Argre Management effectively dissolved.
23        And Mr. Shah said that he would
24 consider allowing us to participate as
25 customers and clients with different

1    entities, those that were no longer
2    affiliated with or related to Mr. Stein
3    and -- Mr. Stein and Mr. Lhote, and the
4    economics would most likely change because
5    there would be additional competitors in the
6    marketplace, North Channel Bank, the ability
7    to get liquidity in shares would be impacted,
8    and that we would be -- the pension plans
9    would be receiving a lower percentage based
10   on the market pricing and the fees paid to
11   the other counterparties.
12           And that became 66 percent to
13   75 percent that would be paid away by the
14   pension plans because of this market
15   development, and perhaps Mr. Shah being upset
16   and associating Mr. Van Merkensteijn and
17   myself with the actions of my former
18   partners.
19       Q   So, in this particular case, adding
20   competitors into the market actually drove up
21   the fee as opposed to the additional
22   competitors usually driving a fee down?
23       A   No.  Additional competitors in the
24   marketplace drive up the cost of borrowing
25   shares if it's a stock lending transaction,